# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARION ALDRICH,

     Plaintiff,

       v.

SYLVIA M. BURWELL, Secretary, United
States Department of Health and Human
Services,

     Defendant.

Civil Action No. 15-1662 (JEB)

## MEMORANDUM OPINION

Plaintiff Marion Aldrich works as a policy analyst in the U.S. Department of Health and Human Services' Office of the Assistant Secretary for Preparedness and Response. She is 57 years old and has long been diagnosed with and treated for Attention Deficit Disorder (ADD). Her otherwise uneventful 20-year stint in government service was upended in February 2012 when she began reporting to a new, younger supervisor, Serina Vandegrift. Plaintiff claims that Vandegrift, motivated by discriminatory animus given Aldrich's age and disability, created a hostile work environment, and discriminated and retaliated against her through a series of workplace incidents. After pursuing some administrative redress, Plaintiff brought suit here. The government has now filed a Partial Motion to Dismiss, contending that all of Aldrich's harms, taken together, do not constitute a hostile work environment, and that one of the specific incidents she complains of – a so-called "Leave Restriction" – is not severe enough to count as a discrete act of discrimination or retaliation. The Court agrees with Defendant's assessment and will grant the Motion.

## I. Background

The Court, as it must at this stage, draws the facts from the Complaint. Aldrich, a 57-year-old Cuban *émigré* with a master's degree in public health, began working as a public-health advisor for the Centers for Disease Control and Prevention in 1992. See Compl., ¶¶ 7-9. For the next 20 years, she had a relatively uncontroversial civil-service career. Id., ¶ 12. In February 2012, while Plaintiff was working as a policy analyst in the Executive Secretariat for the Office of the Assistant Secretary for Preparedness and Response (ASPR), Vandegrift became that office's Director and, consequently, Aldrich's boss. Id., ¶¶ 9-11.

Vandegrift was "much younger [and] less experienced" than Plaintiff, id., ¶ 9, which apparently generated some resentment towards Aldrich, given the latter's "greater age and experience." Id., ¶ 25. "[W]ithin months of working under Vandegrift," Plaintiff began to experience "abusive and discriminatory conduct." Id., ¶ 12. She does not elaborate what conduct that was, but notes that in July 2012, she filed an informal complaint with the Department's Equal Employment Opportunity (EEO) office, describing "a pattern of rude and demeaning treatment [by Vandegrift] . . . motivated by unlawful considerations including age." Id. Aldrich eventually dropped the complaint in the hopes that "[Vandegrift's] experience of being called out for abusive and discriminatory conduct might have a chastening effect on [her] going forward." Id., ¶ 20. She does not state whether Vandegrift was ever made aware of this complaint.

About a month after filing her EEO complaint, Plaintiff in August 2012 requested a "quiet work space" as an accommodation for her ADD. Id., ¶ 13. She received that accommodation without much intervention from her employer, as a co-worker who had a quiet office agreed to swap spaces with her. Id., ¶¶ 14, 19. Almost a year later, however, the whole

office, in June 2013, had to "move to another building," at which point Vandegrift "assigned Aldrich to a noisy cubicle directly across from Vandegrift's own office, where she could closely monitor Aldrich and her movements." Id., ¶ 19. (Aldrich does not allege that she ever formally voiced her objection to the new cubicle or otherwise told her employer that it no longer accommodated her disability.)

Plaintiff notes that from roughly late 2012 through 2013, "Vandegrift's more abusive conduct did abate for a time." Id., ¶ 21. "The daily criticism lessened," and Plaintiff received what were, in her mind, fair performance appraisals for both 2012 and 2013. Id., ¶¶ 21, 25. About three months after Aldrich's successful performance review for 2013, however, the armistice began to crack. Id. at ¶ 25.

In May 2014, Vandegrift reprimanded Plaintiff for "unacceptable work performance, failure to follow instructions and failure to submit leave that accurately reflects time away from the office." Id., ¶ 26. In addition, Vandegrift claimed that she had "consistently counseled [Aldrich] on these issues since May 2012, throughout 2013 until the present day." Id. ¶ 27. Plaintiff disputes the legitimacy of the "unacceptable work performance" claim, since Vandegrift "had rated Ms. Aldrich's actual job performance as fully successful" for at least the 2012-2013 time period. Id., ¶¶ 26-27. But Plaintiff does not allege that the other infractions – *i.e.*, "failure to follow instructions and failure to submit leave . . . accurately" – were untrue. Id., ¶ 26. Similarly, she does not allege that Vandegrift was incorrect in claiming that she routinely counseled Plaintiff. Instead, Plaintiff explains, "If Vandegrift was demanding to meet with Aldrich on a weekly basis, it was not for any legitimate purpose, but to harass and demean her, to undermine her faith in herself and in her work, and ultimately to drive her from government service." Id., ¶ 28.

Following that reprimand, Plaintiff filed a complaint with her union alleging that Vandegrift's criticisms were motivated solely by "Aldrich's age and disability, and by her persistent efforts to obtain . . . reasonable accommodation[s]." Id., ¶ 30. That complaint met a swift demise, id., ¶ 31, and Plaintiff did not follow up with an EEO complaint. Id., ¶ 32.

In October 2014, Vandegrift then suspended Plaintiff for five days for "bogus performance and behavioral 'reasons.'" Id., ¶ 33. This time, Plaintiff took the matter to the agency's EEO office, filing an informal complaint in which she "challenge[d] the suspension as part of a pattern of [discrimination] . . . based upon age and disability, repeated requests for reasonable accommodation," and retaliation for Aldrige's "exercis[ing] of [her] rights protected by law." Id., ¶ 34. On October 30, 2014, the EEO sent Vandegrift a notice regarding Plaintiff's informal complaint, and she acknowledged receipt the following day (a Friday). Id., ¶¶ 35-36.

The next Monday, November 3, 2014, Vandegrift handed Aldrich a memorandum titled "Leave Restriction" in which she made clear that Plaintiff would face closer scrutiny of her whereabouts during the workday. Id., ¶ 37. "[F]or the next six-month period[,] Aldrich was to announce [to Vandegrift] any arrival, as well as each and every departure during the day, that might take 15 minutes or more." Id., ¶ 39. Despite the title of the memorandum, however, Plaintiff does not allege that the "Leave Restriction" in any way hampered her ability to take sick or vacation leave to which she was entitled. Nevertheless, the requirement that Plaintiff inform Vandegrift of her comings and goings caused her a great deal of stress, sleep deprivation, and fatigue. Id., ¶ 40. On February 5, 2015 – about three months into the leave restriction – Aldrich converted her October 2014 informal EEO complaint regarding the five-day suspension into a formal one. Id., ¶ 41.

The final major action Aldrich complains of is an April 2015 reprimand by Vandegrift in

which she recommended that Aldrich again be suspended for fourteen days, "this time for allegedly failing to adhere to prescribed leave policy on [the] day a blizzard was underway in Washington, D.C." Id., ¶ 45. Vandegrift's supervisors approved the suspension in June 2015 but reduced the duration to ten days. Id., ¶ 46. As she did with the October 2014 suspension, Plaintiff brought this matter to the EEO as another illustration of her supervisor's discrimination. Id., ¶ 47. She has yet to receive a final decision from the EEO on the matter. See Opp. at 11-12 n.3.

Before wrapping up, there are a few odds and ends that bear mention. First, one of Aldrich's co-workers, Susie Nunez, allegedly offered a "sworn statement to the Department" – perhaps during the EEO process, although the Complaint does not say – attesting to various things Vandegrift told Nunez that illustrated her animus towards Plaintiff. See Compl., ¶¶ 15-18 (alleging that Vandegrift told Nunez, inter alia, that Aldrich was "unstable and crazy," that she was disappointed that Nunez had agreed to switch offices with Aldrich, and that she had contemplated "hanging several large bullhorns – which she kept in her office – 'right above the door so [they] can swing and hit people like Ms. Aldrich'"). Although Aldrich was clearly made aware of these statements before she filed this suit, she never says when, over the nearly four-year period preceding such date, she learned of them.

Second, Aldrich offers a few other isolated anecdotes from 2015 that she claims reveal Vandegrift's "pattern of abusive conduct." Id., ¶ 42. First was an incident in March or April 2015 in which Vandegrift came to her cubicle and "scream[ed] at her and berat[ed] her." Id., ¶ 43. Another was Vandegrift's directing Aldrich to pull articles from the National Institutes of Health's archives on the Ebola virus going back to 1950. See id., ¶ 42; Opp., Exh. 2 (July 9, 2015, Email Chain) ("Please provide me a list of resources that speak to the issue, and if

possible, print or order the articles. I would do a search as far back as 1950."). This task, in Aldrich's eyes, was patently abusive because "Vandegrift must have been aware that Ebola was only [first] identified in 1977." Compl., ¶ 42. A third was Vandegrift's mistakenly accusing Aldrich of being late for work when Aldrich "was actually 30 minutes early." Id.; see Opp., Exh. 1 (July 15, 2015, Email Chain) ("I just realized you are early and not late – something I am not used to. No need to respond since you are early."). The last example is that in September 2015, Vandegrift accused Aldrich of "failing to arrange for coverage" and neglecting to put in place an "out-of-office reply" on her email when Aldrich took two hours of approved leave during the workday "in order to participate with her attorney in a conference call with the EEO Counselor." Compl., ¶ 49. Plaintiff claims that Vandegrift emailed Plaintiff while she was on that call to complain of her leave violations, even though "Vandegrift must have known [Aldrich was in the midst of] a conversation with an EEO Counselor." Id., ¶ 48

In October 2015, Plaintiff filed a seven-count Complaint in this Court. Counts I through III arise under the Age Discrimination in Employment Act. Count I alleges a hostile work environment; Count II alleges age discrimination based on the leave restriction and her suspensions; and Count III alleges Defendant retaliated against her "for objecting to discriminatory treatment because of age" by imposing the suspension and the leave restriction and by creating a hostile work environment. Counts IV through VII arise under the Rehabilitation Act and largely mirror the ADEA counts: hostile work environment (Count IV), disability discrimination (Count V), and retaliation (Count VII). The only different one is a failure-to-accommodate claim (Count VI), which is not raised in the present Motion.

Defendant has now filed a Motion to Dismiss in which it seeks complete dismissal of the stand-alone hostile-work-environment claims (Counts I and IV). Because Aldrich also relies on

the existence of a hostile work environment to substantiate her retaliation claims, the government also seeks partial dismissal of Counts III and VII. Finally, Defendants move for partial dismissal of Counts II, III, V, and VII to the extent they rely upon the "leave restriction" as an adverse employment action. This Motion is now ripe.

## II.     Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of an action where a complaint fails "to state a claim upon which relief can be granted." In evaluating Defendants' Motion to Dismiss, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (citation omitted); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1250 (D.C. Cir. 2005). The pleading rules are "not meant to impose a great burden upon a plaintiff," Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005), and she must thus be given every favorable inference that may be drawn from the allegations of fact. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 584 (2007).

Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, id. at 555, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). Plaintiff must put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. The Court need not accept as true "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the Complaint. Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)

(internal quotation marks omitted)).  For a plaintiff to survive a 12(b)(6) motion even if

"recovery is very remote and unlikely," moreover, the facts alleged in the complaint "must be

enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555-56

(citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

**III.    Analysis**

In considering Defendant's Partial Motion to Dismiss, the Court first discusses certain

concessions related to her discrimination counts (II and V).  It will then move to the retaliation

counts (III and VII), focusing specifically on whether the "Leave Restriction" is cognizable as an

act of retaliation – *i.e.*, whether it is a "materially adverse action."  Wrapping up, it will last

address whether Aldrich has sufficiently alleged a hostile work environment, as pled in Counts I,

III, IV, and VII.

A.  Discrimination (Counts II and V)

In Count II, Plaintiff alleges that the government discriminated against her on the basis of

her age "by subjecting her to a suspension and [the] Leave Restriction."  Compl., ¶ 56.  In Count

V, she alleges discrimination via those same actions, this time on account of her disability.  See

id., ¶ 68.  In her Opposition, however, Plaintiff concedes that "the humiliating and needless leave

restriction" does not "giv[e] rise to an actionable discrimination claim."  Opp. at 2.  The Court

will therefore grant Defendant's Motion to Dismiss these two counts to the extent they rely on

the Leave Restriction as a discrete act of discrimination.

Aldrich also offers another concession – namely, that the ambiguous "suspension"

referred to in her discrimination claims (Counts II and V) only refers to her five-day suspension

in October 2014 and not her ten-day suspension in June 2015.  This is because she has

admittedly failed to exhaust her administrative remedies as to the latter suspension, as she filed

suit here before 180 days had passed from the filing of her EEO complaint.  See Opp. at 11 n.3.

The Court thus cannot properly adjudicate whether the latter suspension constituted

discrimination under either the ADEA or the Rehabilitation Act.  See Murthy v. Vilsack, 609

F.3d 460, 465 (D.C. Cir. 2010) ("[A] federal employee must wait 180 days, absent final action

by the EEOC, before filing a lawsuit in the federal district court.").  Despite her concession on

this issue, Plaintiff requests that such claims should be dismissed without prejudice.  See Opp. at

11 n.3.  The Court agrees that such a course is proper.  The only discrete act of discrimination

that remains "live" in Counts II and V, therefore, is the October 2014 suspension.

    B.  Retaliation (Counts III and VII)

Counts III and VII allege retaliation for engaging in protected activity – specifically, that

Defendant "subjected her to suspension and [the] Leave Restriction" in retaliation for Aldrich's

filing of an October 2014 EEO complaint in which she charged Vandegrift with disability- and

age-based discrimination.  See Compl., ¶¶ 59, 74.  As was the case with Plaintiff's

discrimination claims, Defendant does not, at this stage, challenge whether the five-day

suspension in October 2014 counts as a retaliatory act.  The parties also agree that, as with the

discrimination counts, the 10-day suspension in June 2015 shall play no role in Plaintiff's

retaliation claims, given Aldrich's failure to exhaust.  What remains, then, is the issue of whether

the Leave Restriction counts as a discrete act of retaliation.

"To prove retaliation" under the ADEA and Rehabilitation Act, "the plaintiff generally

must establish that he or she suffered (i) a materially adverse action (ii) because he or she had

brought or threatened to bring a discrimination claim."  Baloch v. Kempthorne, 550 F.3d 1191,

1198 (D.C. Cir. 2008) (setting forth standard for both statutes).  The central question raised by

Defendant pertains only to the first requirement: whether the "Leave Restriction" rises to the

level of a "materially adverse action." If it does not, Aldrich cannot make out a *prima facie* case of retaliation on that basis, even if Vandegrift were impermissibly motivated when she subjected Plaintiff to the restriction.

The reason Plaintiff conceded the issue in her discrimination counts but challenges it here is that the standards differ. "'Adverse actions' in the retaliation context" – referred to most frequently as materially adverse actions – "encompass a broader sweep of actions than those in a pure discrimination claim." Baloch, 550 F.3d at 1198 n.4. A retaliatory act is "materially adverse" if, objectively speaking, it "would have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 1198 & n.5 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006)). At the same time, however, the statutes' "antiretaliation provision[s] protect[] an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington, 548 U.S. at 67 (interpreting Title VII's antiretaliation language); see Baloch, 550 F.3d at 1198 & n.4 (applying Burlington in the context of ADEA and Rehabilitation Act retaliation). In that regard, "[a]n employee's decision to report discriminatory behavior cannot immunize [her] from those petty slights or minor annoyances that often take place at work and that all employees experience." Burlington, 548 U.S. at 68. Getting to the heart of the matter, then, the Court must determine whether the "Leave Restriction" is, as Plaintiff contends, properly categorized as a materially adverse action, or if it falls into the bucket of "petty slights or minor annoyances" that do not give rise to a claim of retaliation. Id.

The D.C. Circuit has not grappled with this precise fact pattern, but the courts that have done so are near unanimous in concluding that close scrutiny, monitoring, or tracking of an employee's whereabouts – without more – simply does not rise to the level of a materially adverse retaliatory action sufficient to survive a motion to dismiss. See, e.g., Jaeger v. N.

Babylon Union Free Sch. Dist., No. 15-5452, 2016 WL 3198276, at \*15 (E.D.N.Y. June 7, 2016) (monitoring of plaintiff's "attendance, even if [stricter than] the scrutiny given to his colleagues" does not constitute materially adverse action); Lindsey-Grobes v. United Airlines, Inc., No. 14-857, 2014 WL 5298030, at \*10 (D. Md. Oct. 14, 2014) (Plaintiff's claim that she was "subject to retaliatory monitoring of her performance, breaks and bidding on shifts" reflect "at most, 'petty slights, minor annoyances, [or] simple lack of good manners,' see Burlington, [548 U.S. at 68], that cannot be classified as materially adverse . . . ."); Simms v. Navy Fed. Credit Union, No. 02-900, 2002 WL 32971969, at \*5 (E.D. Va. Aug. 27, 2002) ("[I]ncreased monitoring of . . . [plaintiff's] time and attendance[] and her computer log in and out data" is not a materially adverse employment action.); cf. Scafidi v. Baldwin Union Free Sch. Dist., 295 F. Supp. 2d 235, 237, 239 (E.D.N.Y. 2003) ("intensive supervision" of school psychologist not materially adverse where scrutiny resulted in no negative repercussions).

Additional support comes from cases reaching a no-material-adversity conclusion on an employer's motion for summary judgment.  See, e.g., Grice v. FMC Techs., Inc., 216 F. App'x 401, 404, 407 (5th Cir. 2007) (no materially adverse action where plaintiff was "watched more closely than others"); Harbuck v. Teets, 152 Fed. App'x. 846, 848 (11th Cir. 2005) (no materially adverse action where plaintiff complained that "she has been subject to heightened scrutiny"); Poppy v. City of Willoughby Hills, 96 F. App'x 292, 295 (6th Cir. 2004) (no materially adverse action for First Amendment retaliation where plaintiff's supervisor was alleged to have "review[ed] her time sheets, request[ed] keys to her office to inspect records kept there, or install[ed] a security camera in the hall outside her office"); Harris v. Firstar Bank Milwaukee, N.A., 97 F. App'x 662, 663 (7th Cir. 2004) (Plaintiff's "allegations of inappropriate supervisory behavior do not suggest a degree of harm sufficient to constitute an adverse

employment action."); accord Daniels v. Connecticut, No. 12-93, 2015 WL 4886455, at *7, 17 (D. Conn. Aug. 17, 2015) (no materially adverse action where employer began to look more closely at plaintiff's log entries and criticize her for taking long breaks); Daggs v. Donahoe, No. 11-357S, 2014 WL 2434952, at *5 (W.D.N.Y. May 30, 2014) (no materially adverse action where plaintiff alleged, "My moves and everything that I did was overseen like a helicopter parent."); Flowers v. City of Tuscaloosa, No. 11-1375, 2013 WL 625324, at *24 (N.D. Ala. Feb. 14, 2013) ("[M]onitoring . . . has generally been deemed not actionable in itself.") (citation omitted); Workneh v. Pall Corp., 897 F. Supp. 2d 121, 135 (E.D.N.Y. 2012) (same); Soublet v. Louisiana Tax Comm'n, 766 F. Supp. 2d 723, 735 (E.D. La. 2011) ("[C]omplaints of increased or altered supervision . . . would not dissuade a reasonable worker from making or supporting a charge of discrimination."); Shannon v. VA Dep't of Juvenile Justice, No. 06-413, 2007 WL 1071973, at *4 (E.D. Va. Apr. 4, 2007) (close monitoring of employee's "comings and goings" "fall[s] into the 'petty slights' and 'minor annoyances' category" of employment actions that do not rise to the level of material adversity), aff'd, 258 F. App'x 583 (4th Cir. 2007); Carrero v. Robinson, No. 05-2414, 2007 WL 1655350, at *11 (D. Colo. June 5, 2007) (same).

Although the reasoning of these cases is often either cursory or opaque, a few have helpfully articulated the logic underlying this conclusion. Simply stated, putting in a full day's work is a standard condition of employment. An employer's "[m]onitoring [of] an employee's . . . time and attendance," therefore, "is a basic employment practice, and as such could only be an adverse employment action if [plaintiff] previously had immunity from general employment policies." Simms, No. 02-900, 2002 WL 32971969, at *5 (emphasis added). In other words, closely monitoring an employee's attendance does not "produce[] an injury or harm," Burlington, 548 U.S. at 67, as employers may reasonably require consistent, complete

attendance and take reasonable steps to ensure an employee is not falling short. See Wade v. Dist. of Columbia, 780 F. Supp. 2d 1, 16 (D.D.C. 2011) (Plaintiff's claim – "that his supervisors were overly aggressive in tracking his whereabouts to ensure that he was not avoiding his duties – involves a common aspect of the working environment, and [plaintiff] has not explained how this caused him any harm."); cf. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (courts must take care to avoid "expanding" the antidiscrimination statutes "into a general civility code").

The few cases to have gone the other way share one of two common attributes. The first is the conclusion that where monitoring is not uniformly applied across the workforce, the disparateness of such monitoring may elevate otherwise innocuous attendance tracking to a materially adverse action. See, e.g., Deshpande v. Medisys Health Network, Inc., No. 07-375, 2008 WL 2004160, at *5 (E.D.N.Y. May 7, 2008) (acknowledging that "close monitoring usually does not, without more, constitute a materially adverse action," but denying employer's motion to dismiss retaliation claim where plaintiff alleged that monitoring was "selectively applied" to him and not others); accord Turley v. ISG Lackawanna, Inc., 803 F. Supp. 2d 217, 241 (W.D.N.Y. 2011). The problem with this reasoning, however – and why this Court chooses not to follow it here – is that "[a]lthough selective enforcement of employment policies may be evidence of pretext, such selective enforcement does not alone convert enforcement of a general policy of employment into adverse employment action." Simms, No. 02-900, 2002 WL 32971969, at *5 (emphases added). In other words, "even if [the employer's scrutiny of plaintiff's attendance] differed from the scrutiny given to his colleagues," such scrutiny does not, without more, "constitute an adverse employment action," as it does not "produce[] an injury or

harm." Jaeger, No. 15-5452, 2016 WL 3198276, at *15. A "petty slight" is still a "petty slight," even if that slight is disparately applied.

The second common characteristic of cases in which close monitoring might be materially adverse is where the monitoring is so extreme and intrusive as to constitute harassment in its own right. In MacDonald v. United Parcel Serv., 430 Fed. App'x 453 (6th Cir. 2011), for instance, the Sixth Circuit concluded that allegations of an employer's "extreme scrutiny in the form of hidden surveillance cameras and tails" was sufficient to establish a plausible ADA-retaliation claim. Id. at 465-66. Similarly, in Ortez v. Washington County, Oregon, 88 F.3d 804 (9th Cir. 1996), the Ninth Circuit denied an employer's motion to dismiss where it conducted "extreme supervision" in the form of "order[ing] another employee to follow [plaintiff] and otherwise confirm his whereabouts during the day." Id. at 809 & n.3.

These actions cross the line from enforcement of standard employment policies (even if not uniformly applied) to harassing, badgering, and even threatening conduct. See also, e.g., Fercello v. Cty. of Ramsey, 612 F.3d 1069, 1081 (8th Cir. 2010) ("[P]lacing an employee under constant surveillance" may suffice as a materially adverse action); Williams v. Guilford Tech. Cmty. Coll. Bd. of Trustees, 117 F. Supp. 3d 708, 718-19 (M.D.N.C. 2015) (surveillance sufficiently adverse where supervisor "placed a hidden video camera with audio recording outside [plaintiff's] office . . . and continually recorded [her] and anyone entering and leaving [her] office with video and audio") (citation omitted); Rios v. Municipality of Guaynabo, 938 F. Supp. 2d 235, 244 (D.P.R. 2013) ("[P]lacing an employee under constant surveillance could be evidence of retaliation.") (citation omitted).

With that framework in place, the Court concludes that, taking all of Aldrich's allegations as true, she has failed to plead facts showing that Vandegrift's "Leave Restriction" was a

materially adverse employment action. All that was demanded of her was that she "announce any arrival, as well as each and every departure during the day, that might take 15 minutes or more." Compl., ¶ 39. This comes nowhere near the type of Orwellian hyper-surveillance that might, standing alone, satisfy the material-adversity requirement. See Ortez, 88 F.3d at 809. And while Plaintiff might have subjectively found the requirement to be condescending or even infantilizing, her personal response cannot transform an otherwise "minor annoyance[]," Burlington, 548 U.S. at 68, into "an action that would have dissuaded a reasonable worker from making or supporting a charge of discrimination." Baloch, 550 F.3d at 1198 (concluding that employer's "sick leave restrictions," in which it "require[ed] that a physician certify the problem and date of treatment each time [plaintiff] submitted a leave request" did not constitute materially adverse action) (internal citations omitted). In sum, Plaintiff's claim in Counts III and VII that Vandegrift retaliated against her by imposing a Leave Restriction ends here.

C. Hostile Work Environment (Counts I & IV, III & VII)

The next question is whether Aldrich has stated a claim for retaliation or discrimination on the basis of a hostile work environment. Neither the ADEA nor the Rehabilitation Act by their terms makes unlawful a "hostile work environment" – at least not in so many words. Both statutes do, however, bar the government from discriminating against its employees with respect to, *inter alia*, their "terms, conditions, or privileges of employment" because of that person's age or disability. See 29 U.S.C. §§ 623(a)(1) & 633a(a) (age); 29 U.S.C. §§ 794(a), (d) (disability; incorporating standard for discrimination set forth in the Americans with Disabilities Act, see 42 U.S.C. § 12112(a)).

The Supreme Court has read that language broadly, concluding that "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire

spectrum of disparate treatment . . . in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (emphasis added, citations omitted). The D.C. Circuit, in turn, has extended that reasoning in holding that "a hostile work environment can [also] amount to retaliation" under the antidiscrimination laws. Baird v. Gotbaum (Baird I), 662 F.3d 1246, 1250 (D.C. Cir. 2011) (emphasis added, citation omitted). Plaintiff pursues both avenues here, alleging that her employer created a hostile work environment both to discriminate against her (Counts I and IV) and to retaliate against her for engaging in protected activity (Counts III and VII).

That is all well and good, but what, exactly, is a hostile environment? In contrast to other forms of discrimination or retaliation – which typically arise from discrete acts like terminations or suspensions – "[a] hostile work environment typically consists of several individual acts that 'may not be actionable on [their] own' but become actionable due to their 'cumulative effect.'" Baird v. Gotbaum (Baird II), 792 F.3d 166, 168 (D.C. Cir. 2015) (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002) ("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. . . . Such claims are based on the cumulative effect of individual acts.")). This is the path Aldrich pursues, arguing that the entire array of slights she suffered from early 2012 through the fall of 2015, taken together, reveal a discriminatorily hostile working environment. See Opp. at 14 ("The Complaint describes a rich and varied pattern of ongoing abusive conduct from Serina Vandegrift, beginning almost immediately upon becoming Marion Aldrich's supervisor in February 2012, and continuing virtually unabated ever since.").

This timeline presents something of an issue, however, given Aldrich's pleading of a hostile environment as both a form of discrimination and retaliation. Specifically, while the

discrimination chronology may run the entire length of the timeline – *i.e.*, February 2012 through September 2015 – the retaliation chronology can only plausibly start on the day Aldrich first engaged in protected activity.  As that date does not clearly emerge from the Complaint, the Court will assess whether the full timeline of complained-of episodes adequately states a hostile-work-environment claim.  Concluding that it does not, the Court has no need to analyze the separate counts and their incongruent timelines separately.

Now to the merits.  The key question is whether all of the episodes taking place between February 2012 and September 2015, looked at in concert, constitute a hostile work environment. To ultimately succeed on her claims, Aldrich "must show," and the factfinder must find, "that h[er] employer subjected h[er] to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'"  Baloch, 550 F.3d at 1201 (quoting Harris, 510 U.S. at 21).  To survive a motion to dismiss, however, she must merely allege facts capable of supporting such a finding.  See Littlejohn v. City of N.Y., 795 F.3d 297, 321 (2d Cir. 2015) (affirming dismissal of hostile-work-environment claim where "allegations could not support a finding of hostile work environment that is so severe or pervasive as to have altered the conditions of [plaintiff's] employment").  This analysis requires the Court to look "at all the circumstances, including the frequency of the [alleged] discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Vickers v. Powell, 493 F.3d 186, 197 (D.C. Cir. 2007) (citing Harris, 510 U.S. at 23).  The Court must "assess the timeline of events as a whole," to determine whether, in totality, the facts may plausibly support a conclusion that the government "alter[ed] the conditions of [her] employment and create[d] an abusive working environment."

Brooks v. Grundmann, 748 F.3d 1273, 1276 (D.C. Cir. 2014) (citations and quotation marks omitted).

The government maintains a laser-like focus on the "severe or pervasive" requirement, contending that "Plaintiff's allegations are legally insufficient to demonstrate the pervasiveness and severity of hostility necessary to show a hostile work environment." Mot. at 1; see Ahuja v. Detica Inc., 742 F. Supp. 2d 96, 105 (D.D.C. 2010) (dismissing hostile-work-environment claim where plaintiff failed to allege actions that are sufficiently severe or pervasive to meet standard). In other words, even if Vandegrift were motivated by discrimination or a desire to retaliate, and even assuming Aldrich subjectively believed the environment to be hostile, the episodes, taken as a whole, do not reveal an objectively abusive environment.

As the D.C. Circuit has explained, severity and pervasiveness "are complementary factors and often go hand-in-hand, but a hostile work environment claim c[an] be satisfied with one or the other." Brooks, 748 F.3d at 1276. To that end, the plaintiff must either allege a connected series of incidents that are "sufficiently continuous and concerted to be considered pervasive" or set forth facts showing that "a single episode is severe enough to establish a hostile working environment." Brennan v. Metro. Opera Ass'n, Inc., 192 F.3d 310, 318 (2d Cir. 1999) (citations omitted); Cerros v. Steel Techs., Inc., 398 F.3d 944, 951 (7th Cir. 2005) ("[P]ervasiveness and severity are, to a certain degree, inversely related; a sufficiently severe episode may occur as rarely as once, while a relentless pattern of lesser harassment that extends over a long period of time also violates the [antidiscrimination] statute[s].") (citation omitted). "[T]he standard for severity and pervasiveness is . . . an objective one." Baird II, 792 F.3d at 172; see Oncale, 523 U.S. at 81 ("[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'") (quoting

Harris, 510 U.S. at 23).

Plaintiff identifies ten distinct episodes spanning three-and-a-half years that she believes illustrate the abusiveness of her work environment:

1. **February 2012**: Vandegrift "began subjecting . . . Aldrich to rude, hostile, and otherwise demeaning treatment." Compl., ¶ 11.

2. **June 2013**: When the Executive Secretariat moved offices, Plaintiff lost her "quiet work space" and was assigned by Vandegrift "to a noisy cubicle directly across from Vandegrift's own office, where she could closely monitor Aldrich and her movements." Id., ¶¶ 13, 19.

3. **May 2014**: Vandegrift reprimanded Plaintiff for "unacceptable work performance, failure to follow instructions and failure to submit leave that accurately reflects time away from office." Id., ¶¶ 26-27.

4. **October 2014**: Vandegrift suspended Plaintiff for five days. Id., ¶ 33.

5. **November 2014**: After being informed of Aldrich's EEO complaint, Vandegrift placed Plaintiff on "Leave Restriction," meaning she must tell Vandegrift anytime she will be out of the office for more than 15 minutes during the workday. Id., ¶¶ 37, 39.

6. **April & June 2015**: Vandegrift reprimanded plaintiff for "allegedly failing to adhere to prescribed leave policy on [the] day a blizzard was underway in Washington, D.C." and recommended a fourteen-day suspension, which was reduced by Vandegrift's superiors to a ten-day suspension, which she served in June 2015. Id., ¶¶ 45-46.

7. **March or April 2015**: Vandegrift came to Aldrich's cubicle and "scream[ed] at her and berat[ed] her." Id., ¶ 43.

8. **July 2015**: Vandegrift directed Aldrich to research articles on Ebola "as far back as 1950," see July 9, 2015, Email Chain, even though Ebola was not discovered until 1977. See Compl., ¶ 42.

9. **July 2015**: Vandegrift accused Aldrich by email of being late for work when she "was actually 30 minutes early." Id.

10. **September 2015**: In an email, Vandegrift accused Aldrich of "failing to arrange for coverage" and neglecting to put in place an "out-of-office reply" on her email when Plaintiff took two hours of approved leave to speak to her EEO counselor. Id., ¶ 49. The email was apparently sent during Aldrich's meeting with her EEO counselor, and Plaintiff alleges that Vandegrift "must have known that." Id.

To bolster her claim, she also submits that Vandegrift expressed her disdain for Aldrich to one of Aldrich's co-workers, Susie Nunez. See id., ¶¶ 15-18.

These incidents, taken as true and evaluated as a whole, may well have been unpleasant, but they simply do not reveal a pattern of behavior that is either sufficiently severe or pervasive to support a conclusion that the government subjected Aldrich to "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."  Baloch, 550 F.3d at 1201 (citation omitted).

To begin, the first incident – Vandegrift's allegedly "rude, hostile, and otherwise demeaning treatment," Compl., ¶ 11 – is too vague and conclusory to meaningfully contribute to Aldrich's claim that her working environment was "permeated with discriminatory intimidation, ridicule, and insult."  Morgan, 536 U.S. at 116 (citation omitted); see Brady v. Livingood, 456 F. Supp. 2d 1, 11 (D.D.C. 2006) (dismissing hostile-work-environment claim where plaintiff alleged only "[v]ague, conclusory statements") (citation omitted), aff'd sub nom. Brady v. Office of Sergeant at Arms, 520 F.3d 490 (D.C. Cir. 2008).  Similarly, the conversations held between Vandegrift and Nunez offer little support for Plaintiff's claim, as she has nowhere claimed that she knew of those statements at any time prior to the filing of her Complaint here.  See Wise v. Ferriero, 842 F. Supp. 2d 120, 126 (D.D.C. 2012) ("Conduct that [plaintiff] did not know about . . . cannot not be used to establish that he was subjected to a hostile work environment.").  Plaintiff argues that such statements are useful for establishing evidence of pretext, but effectively concedes that the conversations Nunez had with Vandegrift cannot help establish whether the environment itself was hostile.  See Opp. at 14 n.5.

None of the remaining episodes reflects "severe" or "offensive" conduct of the type that might create an objectively abusive environment.  See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) ("[C]onduct must be extreme to amount to a change in the terms and conditions

of employment."). Most relate to workplace reprimands – and punishment flowing from them – that are well within the bounds of "ordinary tribulations of the workplace." Faragher, 524 U.S. at 788 (citation omitted). For that reason, "courts typically do not find . . . work-related actions by supervisors to be sufficient for a hostile work environment claim." Munro v. LaHood, 839 F. Supp. 2d 354, 366 (D.D.C. 2012) (citation omitted); see also, e.g., Baloch, 550 F.3d at 1201 (affirming grant of summary judgment to employer where hostile environment allegedly consisted of several reprimands, requiring pre-approval of any sick leave, reassigning plaintiff's duties and diminishing his responsibilities, proposing two separate suspensions, giving plaintiff a poor performance review, and several verbal altercations); Nurriddin v. Bolden, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) ("[T]he removal of important assignments, lowered performance evaluations, and close scrutiny of assignments by management [cannot] be characterized as sufficiently intimidating or offensive in an ordinary workplace context.").

In addition, the fact that the group includes one of the alleged discrete acts of discrimination – i.e., the October 2014 suspension – does not perforce establish a hostile environment. See Nurriddin, 674 F. Supp. 2d at 94 ("[M]ere reference to alleged disparate acts of discrimination . . . cannot be transformed, without more, into a hostile work environment.") (citation omitted). The "Leave Restriction" easily lands in this category as well, falling far short of anything that could be objectively seen as offensive or abusive. See supra Section III.B.

Undoubtedly, some of the episodes – like the incident in which Vandegrift screamed at Plaintiff in April 2015 – certainly "reflect poorly upon [Vandegrift's] professionalism." Barbour v. Browner, 181 F.3d 1342, 1348 (D.C. Cir. 1999). But even such unpleasant behavior by a supervisor is not of a piece with the discriminatory, insulting, and offensive conduct normally required of a hostile-environment claim. See Brooks, 748 F.3d at 1277 (incident in which

supervisor allegedly "yelled at [plaintiff] and violently threw a book (thick notebook) on a table" was "at its worst . . . an isolated expression of frustration," which "alone cannot rise to the level of severity indicating hostility or abuse"); Munro, 839 F. Supp. 2d at 366 (same); accord Faragher, 524 U.S. at 788 ("[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'") (emphasis added, citation omitted).

Looking at the span of dates further undermines Plaintiff's claim. That the three-and-a-half-year period comprising this allegedly hostile environment was dotted with loosely related workplace grievances does not reveal a "pervasive" pattern of abuse. See Nurriddin, 674 F. Supp. 2d at 94 (That "the alleged events are temporally diffuse, spread out over a [nearly] four-year period" also "suggest[s] a lack of pervasiveness."); compare El-Hakem v. BJY Inc., 415 F.3d 1068, 1073 (9th Cir. 2005) (concluding that even though a supervisor's calling an employee "Manny" was not severe, discriminatory conduct, the supervisor's incessant use of that name for over a year, despite the plaintiff's repeated objections, constituted behavior that, despite its lack of severity, was sufficiently pervasive to support a hostile-work-environment claim). And, as Plaintiff herself admits in her Complaint, the working environment was reasonably healthy for a large swath of time spanning 2012 through 2013, see Compl., ¶ 21, suggesting that the environment was a far cry from one that was infected with an air of hostility.

*   *   *

Having disposed of these questions, the Court finds it useful to clarify what remains. Counts I and IV, both of which are based solely on a hostile work environment, will be dismissed in full. Counts II and V (alleging discrimination) and III and VII (alleging retaliation) will be partially dismissed insofar as they rely on (a) the Leave Restriction, (b) the existence of a

hostile work environment, or (c) the ten-day suspension in June 2015.  What remains, then, is the following:

- Count II (age discrimination in the form of the October 2014 suspension);

- Count III (age-based retaliation in the form of the October 2014 suspension);

- Count V (disability discrimination in the form of the October 2014 suspension);

- Count VI (failure to accommodate); and

- Count VII (disability-based retaliation in the form of the October 2014 suspension).

**IV.**     **Conclusion**

For these reasons, the Court will grant Defendant's Partial Motion to Dismiss.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:   July 18, 2016